**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Luna, et al., | No. CV-24-02971-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Taurus International Manufacturing Incorporated, et al., | |
| Defendants. | |

Frank Luna was severely injured in April 2023 when a semi-automatic 9mm Taurus GX4 pistol (the "Subject Pistol") fell to the ground and accidentally discharged, striking him in the leg. In this action, Mr. Luna and his spouse (together, "Plaintiffs") have sued Taurus Holdings, Inc. ("Holdings") and Taurus International Manufacturing Inc. ("TIMI"), asserting product liability and other tort claims.

Now pending before the Court is Holdings' motion to dismiss for lack of personal jurisdiction. (Doc. 19.) The motion is fully briefed (Docs. 23, 26) and neither side requested oral argument. For the reasons that follow, Holdings' motion is granted.

## RELEVANT JURISDICTION FACTS

When ruling on a motion to dismiss for lack of personal jurisdiction, "uncontroverted allegations must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor," but a "plaintiff may not simply rest on the bare allegations of the complaint." *Ranza v. Nike*, *Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (cleaned up). The Court may also consider "deposition

testimony and other evidence" outside of the pleadings to determine whether it has personal jurisdiction. *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 268 (9th Cir. 1995). *See also Lee v. Plex, Inc.*, 2025 WL 948118, *7 (N.D. Cal. 2025) ("The court may also consider 'declarations and other evidence outside the pleadings.'"); 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 12 (2025) ("The plaintiff must supply specific facts in support of personal jurisdiction.").

Holdings provided a declaration from Bret Vorhees ("Vorhees"), its Chief Executive Officer, in support of its motion to dismiss. (Doc. 19-1.)  In response, Plaintiffs provided a "Report and Review of Interim Financial Information" from Taurus Armas S.A. ("Taurus Armas"), the Brazilian company that owns Holdings. (Doc. 23-1.)  Plaintiffs also cite various webpages from the website https://www.taurususa.com ("the Taurus website"). (Doc. 23 at 4-5.)[1]

Accordingly, the summary of facts below is based on the allegations in the First Amended Complaint ("FAC") (where uncontroverted by Holdings), the assertions in Holdings' declaration (where uncontroverted by Plaintiffs' evidence), and Plaintiffs' evidence.

I.    The Defendants

TIMI and Holdings (collectively, "Defendants") are both "Georgia corporations now located in Bainbridge, Georgia." (Doc. 18 ¶ 2.)

According to the Taurus Armas report, one of Holdings' main "operating segments" is "[t]he firearm production process." (Doc. 23-1 at 57.)  However, "Holdings does not have a Federal Firearms License ('FFL'), and therefore cannot legally and does not design, import, manufacture, assemble, test, package, sell, transfer, ship, label, advertise, promote, market, warrant, or repair firearms in any way." (Doc. 19-1 ¶ 8.)  Instead, "Holdings owns various companies that import, design, manufacture, assemble, and then sell firearms in the United States of America." (*Id.* ¶ 2. *See also* Doc. 23-1 at 57 ["[T]hese operations are conducted by Tauras Armas S.A., Taurus Holdings, Inc. and their subsidiaries."].)

---

[1]    Holdings does not object, in its reply, to consideration of the cited webpages.

One of the companies owned by Holdings is TIMI. (Doc. 19-1 ¶ 3.) "Holdings owns all of the shares of TIMI." (*Id.* ¶ 7.) Both companies share the same CEO and certain other employees. (Doc. 18 ¶¶ 4, 74.) In addition, both companies are "included as either insureds or additional insureds on the same insurance policies" and at one point shared the same office. (*Id.*) Both companies also appear to share the same website as well as certain intellectual property. https://www.taurususa.com/company/about-us/ (last visited Sept. 16, 2025) ("© 2025 [TIMI] All Rights Reserved."). Nonetheless, "Holdings and TIMI maintain separate and independent boards of directors, by-laws, minutes, corporate records, financial records, and bank accounts." (Doc. 19-1 ¶ 18.) "TIMI is adequately capitalized," the two companies "do not treat the assets of one entity as the assets of the other," and Holdings "does not direct the day-to-day operations of TIMI." (*Id.* ¶¶ 17, 19-20.)

One of the firearms "that TIMI imports, manufactures, or assembles" is the Subject Pistol. (*Id.* ¶ 10.) TIMI "does not sell firearms directly to consumers" and only sells firearms "to independent federally-licensed distributors or dealers." (*Id.* ¶¶ 2, 10.) TIMI's records show that TIMI sold the Subject Pistol to Lipsey's, Inc. ("Lipsey's"), located in Baton Rouge, Louisiana, on February 22, 2022. (*Id.* ¶ 15 [Vorhees declaration]; *id.* at 8 [transaction history].)

II.    The Incident

Plaintiffs are citizens of Arizona and live in Yuma County. (Doc. 18 ¶ 1.)

"On April 16, 2023, [Mr.] Luna was severely injured when [the Subject Pistol] fell from an ottoman and unintentionally discharged when it struck the ground." (*Id.* ¶ 8.) "The discharged round struck Mr. Luna's leg, severing his femoral artery, ultimately embedding in his pelvis. The blood loss and severe damage to his leg required extensive emergency surgery. During this incident, Mr. Luna coded three times, including once for 12 minutes. The severe anoxia Mr. Luna suffered has left him with permanent brain damage. Multiple procedures and evaluations have followed, as Mr. Luna is also left with other permanent physical and psychological limitations and deficits, including liver damage, nerve damage,

1   and post-traumatic stress disorder.  The bullet remains in Mr. Luna's pelvis to this day and
2   cannot be removed."  (*Id.* ¶ 9.)

3       "On or about May 23, 2023," a webpage was created at https://gx4safetynotice.com
4   explaining that "'[s]ome GX4 pistols assembled and sold only in the United States may,
5   under certain circumstances, discharge when dropped.'  The website instructs the customer
6   to enter the serial number of their pistol and it 'will promptly let you know whether your
7   GX4 is subject to this Notice.'  When you enter the serial number of Mr. Luna's pistol it
8   confirms that his pistol is subject to the Safety Notice."  (*Id.* ¶ 10.)

9                                    **DISCUSSION**

10  I.    Legal Standard

11      A defendant may move to dismiss for lack of personal jurisdiction.  Fed. R. Civ. P.
12  12(b)(2).  "In opposing a defendant's motion to dismiss for lack of personal jurisdiction,
13  the plaintiff bears the burden of establishing that jurisdiction is proper."  *Ranza*, 793 F.3d
14  at 1068 (citation omitted).  "Where, as here, the defendant's motion is based on written
15  materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie*
16  showing of jurisdictional facts to withstand the motion to dismiss."  *Id.* (citations and
17  internal quotation marks omitted).

18      "Federal courts ordinarily follow state law in determining the bounds of their
19  jurisdiction over persons." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017)
20  (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)).  "Arizona law permits the
21  exercise of personal jurisdiction to the extent permitted under the United States
22  Constitution."  *Id.* (citing Ariz. R. Civ. P. 4.2(a)).  Accordingly, whether this Court has
23  personal jurisdiction over Holdings "is subject to the terms of the Due Process Clause of
24  the Fourteenth Amendment."  *Id.*

25      "Constitutional due process requires that defendants 'have certain minimum
26  contacts' with a forum state 'such that the maintenance of the suit does not offend
27  'traditional notions of fair play and substantial justice.'"  *Id.* (quoting *Int'l Shoe Co. v.
28  Washington*, 326 U.S. 310, 316 (1945)).  Minimum contacts exist "if the defendant has

                                      - 4 -

continuous and systematic general business contacts with a forum state (general jurisdiction), or if the defendant has sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)." *Id.* at 1142 (internal quotation marks omitted).

II.    <u>Personal Jurisdiction</u>

As a preliminary matter, Plaintiffs acknowledge "that this Court does not have general jurisdiction over Holdings because Holdings is a Georgia Corporation with its principal place of business in Georgia." (Doc. 23 at 7 n.1.) The analysis thus focuses on specific jurisdiction.

To determine whether Holdings has sufficient contacts with Arizona to be subject to specific jurisdiction in Arizona, the Court must apply the Ninth Circuit's three-prong test:

(1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3)    the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Morrill*, 873 F.3d at 1142. "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (internal quotation marks omitted). "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

Courts "generally apply the purposeful availment test when the underlying claims arise from a contract, and the purposeful direction test when they arise from alleged tortious conduct. *Id.* However, "our cases do not impose a rigid dividing line between these two

- 5 -

types of claims" and "the first prong may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023) (cleaned up).

    A.    ***Hurrle***

    In *Hurrle v. Taurus Int'l Mfg., Inc.*, 2024 WL 3226551 (D. Ariz. 2024), another court in this district applied these principles when addressing a similar motion to dismiss. In that case, an Arizona woman dropped a Taurus GX4 pistol, which discharged when it hit the ground and "the bullet struck [the woman] in the neck, causing her death." *Id.* at *1. The woman's sister sued TIMI and Holdings, asserting a variety of claims that mirror the claims in this case. *Id.* Holdings moved to dismiss for lack of personal jurisdiction. *Id.* In her attempt to establish jurisdiction over Holdings, the plaintiff (represented by some of the same counsel who represent Plaintiffs in this case) made various arguments and allegations that mirror the arguments and allegations at issue here:

| *Hurrle* | This Action |
|---|---|
| "Defendants are so intertwined contractually for each other's liabilities that they are essentially one entity." *Hurrle*, 2024 WL 3226551 at *6. | "Defendants are so intertwined contractually for each other's liabilities that they are essentially one entity regarding the allegations in this Complaint." (Doc. 18 ¶ 4.) |
| "[M]any individuals who work on designing, manufacturing, engineering, testing, inspecting, marketing, importing, distributing, supplying, and/or selling Taurus pistols . . . are employees of both TIMI and . . . Holdings." *Hurrle*, 2024 WL 3226551 at *6. | "[M]any individuals who work on designing, manufacturing, engineering, testing, inspecting, marketing, importing, distributing, supplying and/or selling Taurus pistols . . . are employees of both TIMI and Taurus Holdings." (Doc. 18 ¶ 4.) |

| | |
|---|---|
| "Vorhees is the CEO of both Holdings and TIMI." *Hurrle*, 2024 WL 3226551 at *7. | "Vorhees serves as the CEO of both Taurus Holdings and TIMI." (Doc. 18 ¶ 74.) |
| "[T]he Taurus website shows certain connections between Holdings and TIMI: (1) TIMI and Holdings have the same address; (2) the website content is copyrighted by TIMI but the website is maintained by Holdings; [and] (3) notice of copyright infringement claims are to be sent to Holdings." *Hurrle*, 2024 WL 3226551 at *8. | "TIMI and Holdings share the same website. . . . The joint website is maintained by Holdings, but the content is copyrighted by TIMI. . . . Holdings controls TIMI's copyright issues, including notices of claims of copyright and other intellectual property infringement." (Doc. 23 at 4.) |

In response to the plaintiff's allegations and evidence in *Hurrle*, Holdings introduced an affidavit from Vorhees that was almost identical to the affidavit in this case:

| *Hurrle* | This Action |
|---|---|
| "Holdings does not have a federal firearms license and therefore 'cannot and does not design, import, manufacture, assemble, test, package, ship, label, advertise, promote, market, warrant, or repair firearms in any way.'" *Hurrle*, 2024 WL 3226551 at *6. | "Holdings does not have a Federal Firearms License ('FFL'), and therefore cannot legally and does not design, import, manufacture, assemble, test, package, sell, transfer, ship, label, advertise, promote, market, warrant, or repair firearms in any way." (Doc. 19-1 ¶ 8.) |
| "TIMI alone sold the pistol to Lipsey's, which is located in Louisiana." *Hurrle*, 2024 WL 3226551 at *7. | "Attached as Exhibit A is a true and correct copy of the A&D entry showing . . . TIMI's disposition of the Subject Pistol to Lipsey's, Inc., located at 7277 Exchequer Drive, Baton Rouge, Louisiana 70809, on February 22, 2022." (Doc. 19-1 ¶ 15.) |

| | |
|---|---|
| "Vorhees further declares that: (1) although owned by Holdings, TIMI is a separate, distinct, and independent corporation; (2) TIMI and Holdings maintain separate and independent boards of directors, by-laws, minutes, corporate records, financial records, and bank accounts; (3) TIMI is adequately capitalized and TIMI and Holdings do not treat the assets of one entity as the assets of the other; (4) Holdings does not direct the day-to-day operations of TIMI; (5) TIMI, not Holdings, imports, manufactures, and assembles Taurus branded firearms, including GX4 pistols, and sells the firearms from Georgia to federally-licensed distributors; and (6) the limited warranties covering Taurus branded firearms are offered and honored by TIMI." *Hurrle*, 2024 WL 3226551 at *7. | "The firearms that TIMI imports, manufactures, or assembles, including Taurus-branded GX4 pistols assembled by TIMI, are sold by TIMI from Georgia to federally-licensed distributors and dealers throughout the United States. . . . Although owned by Holdings, TIMI is a separate, distinct, and independent corporation. The separate corporate identities of Holdings and TIMI have been maintained. TIMI is adequately capitalized. Holdings and TIMI maintain separate and independent boards of directors, by-laws, minutes, corporate records, financial records, and bank accounts. Holdings and TIMI do not treat the assets of one entity as the assets of the other. Holdings does not direct the day-to-day operations of TIMI. Holdings is not a shell or sham corporation of TIMI. And TIMI is not a shell or sham corporation of Holdings. The limited warranties covering Taurus-branded firearms are offered by and honored by TIMI." (Doc. 19-1 ¶¶ 10, 16-22.) |

After reviewing these submissions, the court in *Hurrle* concluded that the plaintiff failed to properly allege that Holdings had "contacts with Arizona" and failed to show, with evidence, that Holdings purposefully directed its activities at Arizona, purposefully availed itself of the privilege of doing business in Arizona, or that the plaintiff's injuries

1  arose from Holdings' Arizona contacts.  *Hurrle*, 2024 WL 3226551 at *6-9.

2          To the extent Plaintiffs reassert the same arguments in favor of personal jurisdiction

3  that the plaintiff asserted in *Hurrle*, the Court agrees with the reasoning in *Hurrle* and

4  adopts it here.  However, this case is also different from *Hurrle* in some respects.  First,

5  Plaintiffs introduce one additional piece of evidence—the statement from Taurus Armas,

6  the Brazilian company that owns Holdings.  (Doc. 23-1.)  Second, Plaintiffs argue that

7  Holdings is "subject to this Court's specific jurisdiction for two independent reasons.  First,

8  Plaintiffs have adequately pleaded a prima facie case that TIMI is Holdings' actual or

9  apparent agent.  Second, Plaintiffs have adequately pleaded a prima facie case that TIMI

10 and Holdings function as alter-egos such that veil piercing is appropriate."  (Doc. 23 at 8.)[2]

11 Each theory is addressed below.

12      B.    **Agency Theory**

13          1.    The Parties' Arguments

14          Holdings argues that TIMI's "[j]urisdictional contacts cannot be imputed under an

15 agency theory" because "[m]erging parent and subsidiary for jurisdictional purposes

16 requires an inquiry comparable to the corporate law question of piercing the corporate

17 veil."  (Doc. 19 at 8, cleaned up.).  At any rate, Holdings argues that "Plaintiffs' agency

18 allegations . . . are conclusory and lack supporting factual assertions" and that "[i]t is not

19 enough that a subsidiary performs services that are sufficiently important to the foreign

20 corporation that if it did not have a representative to perform them, the corporation's own

21 officials would undertake to perform substantially similar services."  (*Id.* at 9, citation

22 omitted.)    Holdings further argues that "Plaintiffs must show both (1) sufficient

23 jurisdictional contacts for jurisdiction over TIMI in Arizona and (2) that those Arizona-

24 specific contacts can be imputed to Holdings" because "[a] subsidiary . . . might be its

25 parent's agent for claims arising in the place where the subsidiary operates, yet not its agent

26

27 [2]    In *Hurrle*, "Holdings argue[d] that Plaintiff cannot show that TIMI's jurisdictional contacts with Arizona should be imputed to Holdings" but Plaintiff did "not address this
28 argument in her response" so the court declined to reach the issue.  2024 WL 3226551 at *9 n.5.

- 9 -

regarding claims arising elsewhere." (*Id.*, citation omitted.) Last, Holdings argues that, under Arizona's choice of law provisions, "Georgia law should govern the issue of corporate separateness" and "Plaintiffs fail to show facts satisfying any of the requirements for actual or apparent agency." (*Id.* at 10-11.)

In response, Plaintiffs argue that they adequately pleaded "that TIMI is Holdings' actual or apparent agent" and "Holdings does not put forward fact evidence controverting the alleged principal/agent relationship." (Doc. 23 at 8-9.) Further, Plaintiffs argue that "for purposes of specific jurisdiction in the Ninth Circuit, 'the parent company must have the right to substantially control its subsidiaries['] activities,'" and Plaintiffs have shown substantial control "reasonably based in fact, given Holdings'[s] 100% ownership of TIMI, the Taurus Defendants' shared CEO, and Holdings' stated purpose in the eyes of its own parent company, Taurus Armas S.A.—to manufacture and market firearms in the United States—which it can *only* accomplish through its control and direction of its licensed subsidiaries." (*Id.* at 9-10.) Last, Plaintiffs argue that TIMI's contacts with the forum are "sufficient to establish specific jurisdiction" because "TIMI does not dispute jurisdiction" and, in any case, TIMI satisfies the Ninth Circuit's test for specific jurisdiction in Arizona. (*Id.* at 10-15.)

In reply, Holdings argues that "Plaintiffs' Response does not address which state's law should determine whether jurisdictional contacts may be imputed from TIMI to Holdings. Nor do Plaintiffs address any of the Georgia law raised in Holdings's Motion." (Doc. 26 at 5.) In addition, Holdings argues that "Supreme Court and Ninth Circuit precedent foreclose" Plaintiffs' agency arguments, citing *Daimler AG v. Bauman*, 571 U.S. 117 (2014), and *Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017). (Doc. 26 at 5-6.) Holdings argues that "[d]istrict courts in the Ninth Circuit have" applied these cases to conclude that "the agency test cannot be the basis of this court's exercise of specific personal jurisdiction" or express doubt "that it is still valid for imputing jurisdictional contacts." (*Id.* at 6.) Further, Holdings argues that "[e]ven if some agency theory is still viable after *Daimler* and *Williams*," the old agency tests for imputing jurisdictional contacts

"required 'substantial control,'" which is "akin to showing control of day-to-day operations." (*Id.* at 7, citation omitted.)  According to Holdings, Plaintiffs have failed to introduce evidence showing this type of "substantial control" and "the reference to 'Taurus Holdings, Inc.' in a financial statement is insufficient to justify imputing jurisdictional contacts." (*Id.*)

> 2.  Analysis

Historically, the Ninth Circuit used an agency test to determine personal jurisdiction. *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001).  Under that test, a subsidiary's contacts with a forum jurisdiction could be attributed to a parent corporation if the subsidiary performed functions "sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.*

In its 2014 decision in *Daimler*, the Supreme Court rejected this agency test as applied to general jurisdiction, holding that "the inquiry into importance stacks the deck, for it will always yield a pro-jurisdiction answer: 'Anything a corporation does through an independent contractor, subsidiary, or distributor is presumably something that the corporation would do 'by other means' if the independent contractor, subsidiary, or distributor did not exist.'" *Daimler*, 571 U.S. at 135-136.  At the same time, *Daimler* left open the possibility that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction." *Id.* at 135 n.13.

In its 2017 decision in *Williams*, the Ninth Circuit revisited the agency test as applied to specific jurisdiction.  There, the district court dismissed claims against a Japanese corporation for lack of personal jurisdiction and the plaintiffs appealed. *Williams*, 851 F.3d at 1019-20.  Although the Japanese corporation did not have any contacts with the forum jurisdiction, the plaintiffs argued that the contacts of its "wholly-owned subsidiary" were attributable to it under an agency theory. *Id.* at 1020, 1023.  Upholding the district court's dismissal, the Ninth Circuit held that *Daimler*'s "criticism" of the agency test "applies no less in the context of specific jurisdiction than in that of general

jurisdiction" and, therefore, "*Daimler*'s reasoning is clearly irreconcilable with the agency test set forth in *Unocal*." *Id.* at 1024. The court then assumed, without deciding, "that some standard of agency continues to be relevant to the existence of specific jurisdiction" but nonetheless found that specific jurisdiction was lacking because "under any standard for finding an agency relationship, the parent company must have the right to substantially control its subsidiary's activities," and "appellants neither allege[ed] nor otherwise show[ed]" that the parent company had such control. *Id.* at 1024-25.

In the wake of *Williams*, district courts in the Ninth Circuit have largely followed two different approaches to the agency test as it applies to specific jurisdiction. First, some courts have held that a subsidiary's contacts cannot be attributed to a parent corporation under any theory of agency. *MSP Recovery Claims, Series LLC v. Actelion Pharms. US, Inc*, 2024 WL 3408221, *4 (N.D. Cal. 2024) ("[T]he Ninth Circuit has also rejected the agency test in the context of specific personal jurisdiction. So, the agency test cannot be the basis of this Court's exercise of specific personal jurisdiction."). *See also Soelect, Inc. v. Hyundai Motor Co.*, 2024 WL 4293911, *6 (N.D. Cal. 2024) ("[T]he agency test might no longer be valid."). Second, other courts have concluded that a subsidiary's jurisdictional contacts can be attributed to a parent corporation when the parent exercises "substantial control" over its subsidiary. *A-List Mktg. Sols. Inc. v. Headstart Warranty Grp. LLC*, 2025 WL 1674377, *4 (C.D. Cal. 2025) (summarizing *Williams* and concluding that "Plaintiff fails to sufficiently allege or otherwise show that Defendant substantially controlled [a sales representative's] activities").

If the former interpretation is correct, Plaintiffs' agency theory is a non-starter. And even assuming the latter interpretation is correct, such that the agency test still provides a possible pathway for asserting specific jurisdiction over a parent corporation based on the activities of its subsidiary, Plaintiffs have failed to make the necessary showing here because the record does not support that Holdings "substantially controlled" TIMI's activities. Plaintiffs place heavy reliance on the financial statement from Tauras Armas, which describes Holdings' "operating segments" as including "firearms" and "the firearm

production process" and states that "these operations are conducted by Tauras Armas S.A., Taurus Holdings, Inc. and their subsidiaries." (Doc. 23-1 at 57.) This statement does not establish that Holdings exercises substantial control over TIMI's activities—indeed, it says nothing at all about whether (and if so, to what extent) Holdings controls the activities of its subsidiaries.

District courts following *Williams* have stated that substantial control is "a showing higher than normal oversight of a parent over a subsidiary and more akin to control of day-to-day operations." *Soelect, Inc.*, 2024 WL 4293911 at *6 (cleaned up). *See also In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2021 WL 4461199, *3 (N.D. Cal 2021) (declining to exert personal jurisdiction over parent corporation pursuant to the agency test, where the evidence merely "shows close monitoring and risk management, not control of day-to-day operations," and emphasizing that "'[b]eing concerned with profitability and insisting that a subsidiary follow corporate-wide policies does not make a parent an agent of a subsidiary for specific personal jurisdiction purposes; if that was the law, nearly every parent would be subject to personal jurisdiction based on the contacts of its subsidiaries").

In *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, (C.D. Cal. 2022), for example, the plaintiffs argued that two parent companies, Hyundai Motor Company, Ltd. ("HMC") and Kia Motors Corporation ("KMC"), exercised substantial control over their subsidiaries because:

> • HMC and KMC "have the power to appoint board members to [their subsidiaries]. They have exercised this power to appoint board members to these subsidiaries that they believe will manage the subsidiaries with the principal goal of benefiting them."
>
> • HMC "reportedly maintains a 'Global Command and Control Center' in Korea," which constantly "monitors every operating line at all Hyundai plants in the world, in real time." Further, HMA employees "report on quality issues to [HMC]."
>
> • "Senior Korean executives at [HMC] visit Hyundai plants in the United States."
>
> • "Korean speaking 'coordinators' reportedly work at [the subsidiaries] and

1
2

> report on their activities to Korean executives at [HMC] and [KMC],
> respectively, every business day."

3
4
5

> • HMC and [its subsidiary] "share common executives. For example, Jose
> Munoz is the current Global Chief Operating Officer of [HMC] as well as
> the President and CEO of Hyundai Motor North America and the President
> and CEO of [another subsidiary]."

6

*Id.* at 700-01.[3] The court concluded these undisputed allegations established that HMC

7

exercised substantial control over its subsidiaries, because the relationship went "beyond

8

the normal oversight of a parent over a subsidiary." *Id.* at 701. In contrast, the court

9

concluded the allegations were insufficient to establish that KMC exercised substantial

10

control over its subsidiary, because "closely monitoring is not controlling." *Id.* (citation

11

omitted).

12

On this record, Holdings is more akin to KMC than to HMC. Unlike with HMC,

13

there is no evidence or allegation that Holdings "monitor[s]" TIMI in "in real time."

14

Further, there is no evidence or allegation that Holdings has TIMI employees "report on

15

quality issues" or that Holdings "appoints board members" to TIMI with the sole goal of

16

benefiting itself. True, Holdings is a 100% owner of TIMI and shares the same CEO with

17

TIMI. (Doc. 18 ¶¶ 3, 74; Doc. 19-1 ¶¶ 2-3, 7.) And the Taurus Armas report suggests, at

18

a high level of generality, that Holdings and TIMI seek to achieve the same goal. (Doc.

19

23-1 at 57.) Nevertheless, Holdings has provided uncontroverted evidence that it "does

20

not direct the day-today operations of TIMI" and that the two companies observe all of the

21

required formalities of corporate separateness. (Doc. 19-1 ¶¶ 18, 20.) Courts have

22

concluded that these sorts of details are inconsistent with the notion of substantial control.

23

*Sunderland*, 2024 WL 2116069 at *4 (finding insufficient control to establish agency

24

relationship where the plaintiff alleged that a parent company was "responsible for the

25

formulation and manufacturing of the" products at issue but the parent's CFO stated in a

26

declaration that "[t]he day-to-day operation of [subsidiary] are controlled and managed

27
28

---

[3]    Although the decision was subsequently clarified in *In re ZF-TRW Airbag Control Units Prods.*, 2022 WL 19425927 (C.D. Cal. 2022), that subsequent decision did not disturb the court's holdings regarding agency or personal jurisdiction.

1    locally by the employees of [subsidiary]"); *Cal. Gasoline*, 2021 WL 4461199 at *4 (loaning

2    employees and "actively monitor[ing]" profitability and compliance did not establish

3    substantial control).

4            Plaintiffs also argue that the fact that "TIMI and Holdings share the same website"

5    "illustrates the degree to which Holdings controls TIMI." (Doc. 23 at 4.) Plaintiffs

6    emphasize that "the joint website is maintained by Holdings, but the content is copyrighted

7    by TIMI"; that "Holdings assumes responsibility for TIMI's compliance with the joint

8    website's privacy policy"; and that "while the joint website's content is copyrighted by

9    TIMI, Holdings controls TIMI's copyright issues, including notices of claims of copyright

10   and other intellectual property infringement." (*Id.*) But Plaintiffs do not cite any cases or

11   otherwise explain why a shared website or shared intellectual property support a finding of

12   "substantial control." And the Court's own research suggests that a shared domain name

13   is not enough. *Cal. Gasoline*, 2021 WL 4461199 at *4 (no substantial control even though

14   "[a]ll SK Energy employees and all SK Trading employees share an @sk.com email

15   address"); *A-List Mktg.*, 2025 WL 1674377 at *5 (that sales representative "used

16   Defendant's email domain do[es] not demonstrate Defendant's right to substantially

17   control her").[4] Nor does the Court see how Holdings' responsibility for the website's

18   "Privacy Policy" supports a finding of "substantial control."

19           Plaintiffs' remaining argument appears to be that because Holdings' purpose is to

20

---

21   [4]      Nor is it clear that Holdings' website supports Plaintiffs' argument. The "Terms &
     Conditions" page, which Plaintiffs cite in support of their assertion that "the joint website
22   is maintained by Holdings" (Doc. 23 at 4) states that "BrazTech International L.C.,
     ['BrazTech'] (collectively, 'Taurus,' 'we,' 'our,' or 'us') owns and operates this Site."
23   https://www.taurususa.com/terms-conditions (Jan. 7, 2019) (last visited Sept. 16, 2025).
     This page also suggests that notices of copyright infringement should be directed to
24   BrazTech, rather than Holdings. *Id.* Like TIMI, BrazTech is a wholly owned subsidiary
     of Holdings, and there is no evidence or allegation that the two corporations operate as a
25   single entity. (Doc. 23-1 at 44 ["Taurus Holdings, Inc. holds a 100% interest in the
     subsidiaries . . . Braztech International, L.C., Inc."].) The other representations on the
26   Taurus website identified by Plaintiffs are also consistent with the understanding that
     Holdings oversees and assists TIMI in its operations but does not exercise substantial
27   control.     https://www.taurususa.com/company/about-us (last visited, Sept. 16, 2025)
     ("Taurus Holdings *companies* manufacture an incredible array of products . . . .")
28   (emphasis added). *See also id.* ("We [Holdings] employ over three hundred skilled workers
     and staff, who *support* manufacturing, importation, service, sales and marketing of Taurus
     and subsidiary branded firearms.") (emphasis added).

sell firearms, and because Holdings does not have a firearm license, Holdings necessarily relies on TIMI to accomplish its goal.  (Doc. 23 at 10.)  This theory, however, is identical to the *Unocal* test for agency that the Ninth Circuit rejected in *Williams*.  It is not enough that TIMI performs a function that is "sufficiently important to" Holdings "that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services."  *Compare Unocal*, 248 F.3d at 928 (adopting this test) *with Williams*, 851 F.3d at 1024 ("*Daimler*'s reasoning is clearly irreconcilable with the agency test set forth in *Unocal*.").

C.    **Alter Ego Theory**

1.    The Parties' Arguments

Holdings argues that "[u]nder Georgia law, any acts by TIMI directed to Arizona cannot be attributed to Holdings under a veil-piercing theory."  (Doc. 19 at 11.)  According to Holdings, the corporate veil can only be pierced in "[e]xceptional circumstances," such as when "disregard for the corporate form" makes "the corporation a mere sham or a business conduit for the shareholder personally."  (*Id.*, citations omitted.)  In addition, Holdings argues that "Georgia veil-piercing law requires, as a minimum prerequisite, that there be insolvency on part of the corporation" and that another legal remedy, such as money damages, is unavailable.  (*Id.* at 11-12, citations omitted.)  According to Holdings, Plaintiffs have failed to make the required showing of "exceptional circumstances."  (*Id.* at 12.)

In response, Plaintiffs argue that "[t]he facts presented in support of Plaintiffs['] assertion that Holdings and TIMI are intertwined are largely uncontroverted, and additional fact evidence supporting this conclusion is derived from the public statements presented on the Taurus Defendants' joint website."  (Doc. 23 at 16.)  Plaintiffs also argue that Vorhees's declaration that Holdings "does not design, import, manufacture, assemble, test, package, sell, transfer, ship, label, advertise, promote, market, warrant or repair firearms in any way" is undermined by the representations on "the Taurus Defendants' joint website, which markets firearms."  (*Id.*)  Plaintiffs further argue that the Vorhees declaration is

1    contradicted by statements on the website that Holdings "employ[s] over three hundred
2    skilled works and staff, who support manufacturing, importation, services, sales and
3    marketing of Taurus and subsidiary branded firearms," and, as a result of these
4    contradictions, Vorhees's declaration is unreliable. (*Id.*)

5        In reply, Holdings argues that "Plaintiffs' Response does not address any of the
6    cases cited by Holdings regarding the *alter ego* test" and "does not cite any cases where
7    jurisdictional contacts were imputed under an alter ego theory." (Doc. 26 at 8.) Holdings
8    also interprets Plaintiffs' response brief as arguing that federal law, rather than Georgia
9    law, applies and contends that "Plaintiffs' selected quotations from webpages about the
10   Taurus brand" do not show "total domination" or "fraudulent intent" as required in the
11   Ninth Circuit to pierce the corporate veil. (*Id.* at 8-9.) Last, Holdings argues that "district
12   courts routinely find allegations similar to those here about TIMI's website are insufficient
13   to satisfy the alter ego test." (*Id.* at 9.)

               2.    Analysis

14

15       In the Ninth Circuit, "[t]he veil separating affiliated corporations may . . . be pierced
16   to exercise personal jurisdiction over a foreign defendant in certain limited circumstances."
17   *Ranza*, 793 F.3d at 1071.[5] The "alter ego test" requires courts to "determine whether the
18   parent and subsidiary are 'not really separate entities,' such that one entity's contacts with
19   the forum state can be fairly attributed to the other." *Id.* "To satisfy the alter ego test, a
20   plaintiff must make out a prima facie case (1) that there is such unity of interest and
21   ownership that the separate personalities of the two entities no longer exist and (2) that
22   failure to disregard their separate identities would result in fraud or injustice. This test
23   envisions pervasive control over the subsidiary, such as when a parent corporation dictates
24   every facet of the subsidiary's business—from broad policy decisions to routine matters of

25   ─────────────
     [5]    Alternatively, even if Georgia law governs this inquiry, Plaintiffs fail to show that
26   TIMI and Holdings are alter egos under Georgia law. *Baillie Lumber Co. v. Thompson*,
     612 S.E.2d 296, 299 (Ga. 2005) ("Under the alter ego doctrine in Georgia, the corporate
27   entity may be disregarded for liability purposes when it is shown that the corporate form
     has been abused. . . . Plaintiff must show that the defendant disregarded the separateness
28   of legal entities by commingling on an interchangeable or joint basis or confusing the
     otherwise separate properties, records or control.") (cleaned up).

                                    - 17 -

day-to-day operation.  Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Id.* at 1073 (cleaned up).  Although more frequently applied in cases involving general jurisdiction, the same test applies when evaluating specific jurisdiction. *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) (applying alter ego test to analyze specific jurisdiction); *Doe v. Compania Panamena de Aviacion*, 2022 WL 1658229, *1 (9th Cir. 2022) (same); *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 634-38 (N.D. Cal. 2020) (same).

There is no personal jurisdiction over Holdings under the alter ego test for the same reasons there is no personal jurisdiction under the agency test.  If Holdings does not "substantially control" TIMI, it follows there is no alter ego relationship.  *Ranza*, 793 F. 3d at 1073 ("The unity of interest and ownership prong of this test requires a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former.")  (cleaned up).  *See also SSL Americas, Inc. v. Mizuho Medy Co.*, 358 F. App'x 839, 841 (9th Cir. 2009) ("With respect to the degree of control exercised by Medy over MUSA's activities, the relationship between Medy and MUSA was similar to parent-subsidiary relationships recognized as usual and appropriate. . . .  Neither the licensing of Medy's technologies for use in those products nor the provision of technical support by Medy during development and manufacture transform MUSA into Medy's alter ego for the purposes of general jurisdiction.").  Moreover, Holdings has presented evidence that "TIMI is adequately capitalized"; that "Holdings and TIMI maintain separate and independent boards of directors, by-laws, minutes, corporate records, financial records, and bank accounts"; and that "Holdings and TIMI do not treat the assets of one entity as the assets of the other."  (Doc. 19-1 ¶¶ 17-19.)  This evidence further forecloses a finding of an alter ego relationship.  *Ranza*, 793 F.3d at 1074 ("Ranza has presented no evidence Nike and NEON fail to observe their respective corporate formalities.  Each entity leases its own facilities, maintains its own accounting books and records, enters into contracts on its own and pays its own taxes. . . .  Ranza has presented no evidence that NEON is

undercapitalized, that the two entities fail to keep adequate records or that Nike freely transfers NEON's assets, all of which would be signs of a sham corporate veil."); *San Francisco*, 491 F. Supp. 3d at 635 (listing "inadequate capitalization," "commingling of . . . assets," and "disregard of corporate formalities" as factors "suggesting that two entities have a unity of interest and ownership" under the alter ego test).  That Holdings and TIMI share the same objective and share the same website does not change this conclusion. *Chubchai v. AbbVie, Inc.*, 599 F. Supp. 3d 866, 876 (N.D. Cal. 2022) ("[C]ourts recognize that separate corporate entities presenting themselves as one online does not rise to the requisite level of unity of interest to show that the companies are alter egos.").

Plaintiffs' arguments concerning the alter ego test fail for the additional reason that Plaintiffs have not alleged facts or otherwise submitted evidence showing that the failure to disregard Holdings' and TIMI's separate identities would result in fraud or injustice.  To the contrary, because TIMI is adequately capitalized, Plaintiffs presumably can still recover from TIMI for their alleged injuries.  And none of Plaintiffs' other allegations suggest that Holdings uses TIMI to facilitate corporate wrongdoing.  *In re Boon Global Ltd.*, 923 F.3d 643, 654 (9th Cir. 2019) ("Conclusory allegations that Dobson structures companies to escape liability are insufficient to confer personal jurisdiction.  Something more is needed."); *Caston v. F. Hoffmann-La Roche, Inc.*, 729 F. Supp. 3d 930, 948-49 (N.D. Cal. 2024) ("[T]he allegations are that Roche and Genentech shared corporate offices in California circa-2009 until at least 2018, some of their research and development operations were blended, and they had at least one shared officer between both companies.  Taken as true, these allegations fall short of demonstrating that a failure to disregard the separate identities of Roche and Genentech would result in fraud or injustice.") (cleaned up).

To the extent Plaintiffs argue that Vorhees's declaration is unreliable, those arguments are unpersuasive.  As explained above, Vorhees avows, under penalty of perjury, that Holdings "does not design, import, manufacture, assemble, test, package, sell, transfer, ship, label, advertise, promote, market, warrant or repair firearms in any way."

1    (Doc. 19-1 ¶ 8.)    That statement is consistent with statements on the Taurus website

2    suggesting    that    BrazTech,    rather    than    Holdings,    maintains    that    website.

3    https://www.taurususa.com/terms-conditions (last visited Sept. 16, 2025).   Nor does the

4    statement on that website that Holdings "employ[s] over three hundred skilled works and

5    staff, who *support* manufacturing, importation, services, sales and marketing of Taurus and

6    subsidiary branded firearms" (Doc. 23 at 16, emphasis added) contradict Vorhees's

7    declaration.[6]

8            D.    **Jurisdictional Discovery**

9                1.    The Parties' Arguments

10        Plaintiffs argue that "[i]f this Court should conclude that Plaintiff has not met its

11    burden to present a prima facie case that jurisdiction over Holdings is proper, Plaintiff

12    requests  an  opportunity  to  conduct  limited,  jurisdictional  discovery  with  the  Taurus

13    Defendants."   (Doc. 23 at 17-18.)   According to Plaintiffs, jurisdictional discovery is

14    appropriate when there is "a colorable showing comprised of some evidence tending to

15    establish  personal  jurisdiction  over  the  defendant"  and  that  Plaintiffs  have  "adduced

16    substantial evidence" that TIMI is Holdings' agent and that "Holdings and TIMI are alter

17    egos." (*Id.* at 17-18, cleaned up.)  In addition, Plaintiffs argue that jurisdictional discovery

18    is proper because corporate veil piercing requires "a fact-intensive inquiry" and "the facts

19    Holdings would require Plaintiff to allege cannot be uncovered without discovery." (*Id.* at

20    17.)

21        In reply, Holdings argues that Plaintiffs' request for jurisdictional discovery should

22    be  denied  because  it  "is  based  on  a  hunch  about  how  Defendants  observe  corporate

23    formalities."   (Doc. 26 at 9.)   Holdings further argues that "Plaintiffs' request for

24    jurisdictional discovery is the same as the request that this Court denied last year" in

25    *Hurrle*; that "Plaintiffs are not entitled to jurisdictional discovery where they cannot show

26

27    ―――――――――――――
[6]    Because TIMI's jurisdictional contacts cannot be attributed to Holdings under an

28    agency theory or an alter ego theory, it is unnecessary to address Plaintiffs' separate argument that "TIMI's contacts with this forum are sufficient to establish specific jurisdiction." (Doc. 23 at 10-15.)

the basic facts giving rise to personal jurisdiction over Holdings"; and that Plaintiffs' "requested discovery does not address the exceptional circumstances, such as fraud and insolvency, that are required to pierce the corporate veil." (*Id.* at 9-10.) In addition, Holdings argues that "Plaintiffs' belief about what discovery might show is insufficient" to justify jurisdictional discovery "in the face of the specific evidence" that TIMI and Holdings operate as separate corporations. (*Id.* at 10.)

## 2. Analysis

Jurisdictional discovery "may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (citation omitted). However, "[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011) (cleaned p).

Jurisdictional discovery is unwarranted here. Holdings counters each of Plaintiffs' allegations with specific denials, including declarations that Holdings "does not direct the day-to-day operations of TIMI"; that the two companies observe all of the required formalities of corporate separateness; that "TIMI is adequately capitalized"; and that the companies do not "treat the assets of one entity as the assets of the other." (Doc. 19-1 ¶¶ 16-20.) Plaintiffs have not come forward with evidence to controvert this testimony except for largely irrelevant portions of the Taurus website and general statements about Holdings' purpose, listed in a financial statement. None of this evidence tends to show "substantial control" or that Holdings and TIMI share a "unity of interest and ownership."

The Court is sympathetic to the difficulties Plaintiffs face when attempting to show that two privately held corporations operate as a single entity, "[b]ut a mere hunch that discovery might yield jurisdictionally relevant facts" is an "insufficient reason[] for a court to grant jurisdictional discovery." *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 864-65 (9th Cir. 2022) (cleaned up). *Cf. Hurrle*, 2024 WL 3226551 at *10 ("Given the

analysis in the immediately preceding sections of this order, the Court concludes that Plaintiff's request amounts to a mere hunch that discovery might yield jurisdictionally relevant facts.") (cleaned up).

Accordingly,

**IT IS ORDERED** that:

1.    Holdings' motion to dismiss (Doc. 19) is **granted**.

2.    Holdings is **dismissed** from this action.

Dated this 18th day of September, 2025.

Dominic W. Lanza
United States District Judge